FILED

2015 Sep-28  AM 08:53
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **KAREN E. WESSON,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case No.:  2:12-CV-02818-MHH** |
| | } | |
| **WALGREENS SPECIALTY** | } | |
| **PHARMACY, LLC,** | } | |
| | } | |
| **Defendant.** | | |

## <u>MEMORANDUM OPINION</u>

In this fraud and breach of contract action, plaintiff Karen Wesson alleges

that the defendant, Walgreens Specialty Pharmacy, LLC, made promises to her to

induce her to leave her job as a pharmacist at K-Mart and then broke those

promises.  Based on her discussions with a Walgreens's pharmacy supervisor, Ms.

Wesson anticipated that if she accepted a position with Walgreens, she would

become the pharmacy manager at the store that Walgreens planned to open in

Chelsea, Alabama.   When the Chelsea store opened, the Walgreens pharmacy

supervisor decided to hire someone other than Ms. Wesson as the store's pharmacy

manager.  Ms. Wesson worked at various Walgreens stores until she eventually

became the Chelsea pharmacy manager in 2010.  In August 2010, Ms. Wesson

surrendered her pharmacy license following an investigation by the Alabama State

Board of Pharmacy.   Walgreens terminated Ms. Wesson shortly afterwards because she no longer could work as a pharmacist in Alabama.

Ms. Wesson alleges that Walgreens breached her contract and committed fraud by not offering her the position of pharmacy manager at the Chelsea location when that store first opened and by not paying her certain income, including a pharmacy manager bonus.   (Doc. 10, pp. 9–10).[1]   Walgreens has moved for summary judgment on Ms. Wesson's claims.   For the reasons discussed below, the Court grants the motion.

## I.   STANDARD OF REVIEW

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."   Fed. R. Civ. P. 56(a).   To demonstrate that there is a genuine dispute as to a material fact that precludes summary judgment, a party opposing a

---

[1] Ms. Wesson's amended complaint also contains an FLSA claim against Walgreens.   Ms. Wesson concedes that she is not entitled to relief on that claim because as a professional employee, she was exempt from overtime pay.   (Doc. 28, p. 23).   The Court will dismiss with prejudice Ms. Wesson's FLSA claim.   The only remaining claims are Alabama state law claims for breach of contract and fraud.

The Court may decline to exercise supplemental jurisdiction over these state law claims, but the Court has discretion to and will retain jurisdiction over Ms. Wesson's breach of contract and fraud claims.   28 U.S.C. § 1367; *Camp v. City of Pelham*, --- Fed. Appx. ----, 2015 WL 5042720, at *3, n.8 (11th Cir. 2015) ("The district court had federal question jurisdiction based on the FLSA claim, and it exercised supplemental jurisdiction over the state law claims.   28 U.S.C. § 1367(a). When the FLSA claim settled, and only the state law claims remained, the district court could have declined to exercise supplemental jurisdiction, see 28 U.S.C., but it had discretion to and did retain jurisdiction.") (citing *Palmer v. Hosp. Auth. of Randolph Cnty.*, 22 F.3d 1559, 1568 (11th Cir. 1994)).   Because of the age of this case, the Court retains jurisdiction over Ms. Wessons's state law claims.

motion for summary judgment must cite "to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). When considering a summary judgment motion, the Court must view the evidence in the record in the light most favorable to the non-moving party and must draw reasonable inferences in favor of the non-moving party. *White v. Beltram Edge Tool Supply, Inc*., 789 F.3d 1188, 1191 (11th Cir. 2015). "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

## II.    FACTUAL BACKGROUND

Ms. Wesson worked at K-Mart from 2003 until 2007. (Doc. 26-1, p. 9). When she left K-Mart in August 2007 to work for Walgreens, she was a pharmacy manager at the K-Mart store in Pell City, Alabama. (Doc. 26-1, p. 9). K-Mart's 2007 Separation Report states that Wesson's final salary at K-Mart was $2170.00 per week. (Doc. 26-3, p. 32).[2] According to K-Mart's records, Ms. Wesson lost her job at the company because she did not return to work following a medical leave of absence. (Doc. 26-1, p. 10; Doc. 26-3, p. 32).

---

[2] The report that Sears Holdings HR Support Center issued confirms Ms. Wesson's K-Mart salary. The report states that when Ms. Wesson left K-Mart, she was earning $54.23 per hour. (Doc. 26-3, p. 3). If Ms. Wesson worked a forty-hour week, she would have been earning $2,169.20 per week.

Ms. Wesson applied to Walgreens in 2007. (Doc. 26-1, pp. 9–10; Doc. 26-3, p. 4). Walgreens sent Ms. Wesson an automated email, electronically signed by pharmacy supervisor Tammie Koelz, to request a meeting to discuss employment opportunities at Walgreens. (Doc. 26-9, p. 17).[3] A Walgreens recruiter arranged a meeting between Ms. Wesson and Melissa Cochran, the pharmacy supervisor for the Birmingham North District. (Doc. 26-1, pp. 11–12). At that meeting, Ms. Wesson expressed her interest in working at the store that Walgreens was building in Chelsea if she could "get enough money." Ms. Wesson acknowledges that the Chelsea store was not in the district that Ms. Cochran supervised. Instead, Tammie Koelz supervised that district, and Ms. Wesson did not talk to Ms. Koelz before Ms. Wesson accepted a job with Walgreens. (Doc. 26-1, p. 12).

On July 25, 2007, Ms. Cochran provided a written job offer to Ms. Wesson for a position as a pharmacy manager in Walgreens's Birmingham North District. (Doc. 26-3, p. 4). The written offer states that Ms. Wesson would earn $4,645.00 biweekly. (Doc. 26-3, p. 4). The offer included a $20,000 incentive bonus, but provided that Ms. Wesson would have to forfeit the bonus if she worked for Walgreens for less than two years. (Doc. 26-3, p. 6). The offer letter stated: "[y]ou should not consider our offer of employment to be a contract or guarantee

---

[3] Ms. Koelz explained that a recruiter working in the Birmingham office created the email. (Doc. 26-6, p. 21).

of indefinite employment. Employment at Walgreens is at will, is for no definite term, and is subject to Walgreens policies, which can be changed from time to time." (Doc. 26-3, p. 4). Ms. Wesson signed the offer letter on July 27, 2007. (Doc. 26-1, pp. 30–31).

Ms. Wesson acknowledges that Walgreens hired her to work at the Pell City location, which at that time was in the Birmingham North District under the supervision of Melissa Cochran. (Doc. 26-1, pp. 12, 21). Ms. Wesson contends though, based on the conversation she had with Ms. Cochran when she interviewed with Walgreens, that she understood that she eventually would become the pharmacy manager of the Chelsea store. Ms. Wesson explained:

> [while Ms. Cochran] wasn't actually the supervisor for the South, []
> [Ms. Cochran and Ms. Koelz] did hire for each other, and [] [Ms.
> Cochran] would be talking to [Ms. Koelz] and that, once [Ms.
> Cochran] found out what dollar amount she could get approved, that
> she would let me know, but that she definitely wanted to hire me as
> pharmacy manager for [the Chelsea] store.

(Doc. 26-1, p. 12). Ms. Cochran remembers that when she and Ms. Wesson met, Ms. Wesson mentioned her interest in working at the Chelsea location when it opened, but Ms. Cochran denies that she promised the position to Ms. Wesson. (Doc. 26-8, p. 35).

While training at the Doug Baker store shortly after starting at Walgreens, Ms. Wesson met Ms. Koelz. (Doc. 26-6, p. 12). Ms. Wesson told Ms. Koelz that she (Ms. Wesson) expected to become the pharmacy manager at the Chelsea store

when it opened.  (Doc. 26-1, p. 15).   Ms. Koelz told Ms. Wesson that Walgreens had not decided who it would hire as the Chelsea pharmacy manager, but Ms. Wesson could apply for the position.  (Doc. 26-6, p. 12).  Ms. Wesson told Ms. Koelz that Ms. Cochran had discussed the Chelsea position with her.  (Doc. 26-6, p. 12).  According to her deposition testimony, Ms. Koelz told Ms. Wesson that Ms. Cochran did not have the authority to place Ms. Wesson in a pharmacy manager position in a store outside of Ms. Cochran's district.  (Doc. 26-6, p. 12).  Ms. Wesson testified, based on her limited memory of the conversation, that Ms. Koelz "didn't mention the Chelsea store at all," but that she responded to Ms. Wesson's assertion that Cochran had hired her to eventually become the pharmacy manager at the Chelsea Store by "reassur[ing] [Ms. Wesson] that [Ms. Koelz] would have hired [Ms. Wesson] anyway and that she would let [Ms. Wesson] know what [Ms. Koelz] could do."  (Doc. 26-1, p. 15).

Shortly after Ms. Wesson began working for Walgreens, she became a "floater."  (Doc. 28, p. 9).  A floating pharmacist worked in various stores in a particular geographical location covering for pharmacists who were out on leave.  (Doc. 26-6, p. 7).  In September 2007, Ms. Wesson emailed Ms. Cochran to express her displeasure at having "been put on market scheduling as a floater instead of the pharmacy manager at Pell City like we discussed."  (Doc. 26-3, p. 12).  Ms. Wesson also complained about her vacation time and her limited work

hours as a floater.   (Doc. 26-3, p. 12).   Walgreens paid Ms. Wesson $4,645 biweekly when she was a floater, the amount that Walgreens stated it would pay Ms. Wesson in her written job offer.   ((Doc. 26-3, p. 4; Doc. 26-10, ¶ 5).

In October 2007, Walgreens moved the Pell City store from the Birmingham North District to the Birmingham South District, and Ms. Koelz became Ms. Wesson's pharmacy supervisor.  (Doc. 26-6, p. 6).  At some point in October 2007, Ms. Wesson told Ms. Koelz that she did not want to be a floating pharmacist.  Ms. Koelz informed Ms. Wesson that she would have to wait for a permanent position to open up.  (Doc. 26-6, pp. 6, 14).  Ms. Wesson reminded Ms. Koelz that she (Ms. Wesson) wanted to be the pharmacy manager at the Chelsea Walgreens when the store opened.  (Doc. 26-6, p. 14).

In December 2007, Ms. Koelz asked Ms. Wesson to work at the Pelham store to fill a vacancy left by a staff pharmacist who was on medical leave.  (Doc. 26-6, p. 6).  Ms. Wesson agreed.  (Doc. 26-6, p. 6). While Ms. Wesson worked at the Pelham store, Walgreens paid her $4,520.00 biweekly, rather than $4,645.00 biweekly, the salary amount in Ms. Wesson's job offer letter.  (Doc. 26-6, p. 6; Doc. 26-10, ¶ 5).  According to Ms. Koelz, the Pelham store paid its employees on a pay scale different from the pay scale at the Pell City store for which Ms. Cochran had hired Ms. Wesson to work.  (Doc. 26-6, p. 6).  Walgreens paid

Wesson the lower biweekly amount from December 2007 until June 2008.  (Doc. 26-10, ¶ 5).

When Walgreens opened its Chelsea store in April 2008, Ms. Koelz and another Walgreens store supervisor chose someone other than Ms. Wesson to be the pharmacy manager at the store.  (Doc. 26-1, pp. 32–33).  Ms. Koelz offered Ms. Wesson the option of either becoming the pharmacy manager at Walgreens's Sylacauga store or working as a staff pharmacist at Walgreens's Chelsea store. (Doc. 26-6, p. 18).  Ms. Wesson chose to work as a staff pharmacist at the Chelsea store.  (Doc. 26-6, p. 18).[4]  In June 2008, Walgreens increased Ms. Wesson's pay to $4715.00 biweekly.  (Doc. 26-10, ¶ 5).  Sometime before January 29, 2009, Ms. Koelz offered and Ms. Wesson declined the pharmacy manager position at Walgreens's Bessemer store.  (Doc. 26-1, pp. 26–27).  Ms. Wesson remained at the Chelsea store.  Walgreens increased Ms. Wesson's pay to $4,895.00 biweekly in June 2009.  (Doc. 26-10, ¶ 5).

In the summer of 2009, Ms. Koelz asked Ms. Wesson to move from Chelsea to the Sylacauga store as the pharmacy manager.  (Doc. 26-1, pp. 27–29).  This time, Ms. Wesson agreed to move.  (Doc. 26-6, p. 18).  Ms. Koelz agreed to allow Ms. Wesson to transfer back to her staff pharmacist position in Chelsea after two

---

[4] While she worked as a staff pharmacist at the Chelsea store, Ms. Wesson was coded in Walgreens's system as a pharmacy manager, and she received pharmacy manager pay.  Ms. Wesson did not have pharmacy manager responsibilities while she worked at the Chelsea store. (Doc. 26-6, p. 18).

months of working in Sylacauga. (Doc. 26-1, p. 28).[5] Ms. Wesson returned to the Chelsea store in February 2010 as a pharmacy manager. (Doc. 26-1, p. 7; Doc. 26-2, p. 21; Doc. 26-6, p. 19).

Ms. Wesson voluntarily surrendered her pharmacy license in August 2010 in response to an investigation by the Alabama Board of Pharmacy. The investigation concerned whether Ms. Wesson had violated Alabama law by filling her own prescriptions without authorization. (Doc. 26-4, pp. 3–6). The Alabama Board of Pharmacy issued a final order suspending Ms. Wesson's license to practice pharmacy and requiring her to pay a fine in June 2011. (Doc. 26-4, pp. 2–10). After surrendering her license, Ms. Wesson could no longer work as a pharmacist in Alabama. (Doc. 26-4, pp. 1–10). Walgreens terminated her employment in August 2010. (Doc. 26-2, pp. 21–22). Ms. Wesson filed this lawsuit on August 27, 2012. (Doc. 1).

## III. DISCUSSION

### A.     The statute of limitations bars Ms. Wesson's fraud claim.

Under Alabama law, the statute of limitations for a fraud claim is two years from the date a claim accrues. A claim "must not be considered as having accrued until the discovery by the aggrieved party of the fact constituting the fraud, after

---

[5] Mr. Koelz testified that she did not specify the amount of time that Ms. Wesson would work in the Sylacauga store. (Doc. 26-6, p. 18). Construing the facts in the light most favorable to Ms. Wesson, the Court accepts as true for summary judgment purposes Ms. Wesson's testimony that Ms. Koelz told Ms. Wesson that she would return to the Chelsea store in two months.

which he must have two years within which to prosecute his action." Ala. Code. §
6-2-3 (1975). "The two-year limitations period begins to run when a plaintiff is
privy to facts which would 'provoke inquiry in the mind of a [person] of
reasonable prudence, and which, if followed up, would have led to the discovery of
the fraud.'" *Sirmon v. Wyndham Vacation Resorts, Inc.*, 922 F. Supp. 2d 1261,
1272 (N.D. Ala. 2013) (alteration in original) (quoting *Auto-Owners Ins. Co. v.
Abston*, 822 So. 2d 1187, 1195 (Ala. 2001)).

Ms. Wesson's fraud claim rests on two alleged misrepresentations. Ms.
Wesson contends that Walgreens promised that she would become the pharmacy
manager of the Chelsea location when that store opened and that the company
would not pay her less than $4,645.00 biweekly for a period of two years. Ms.
Wesson admits that when the Chelsea store opened in early 2008, she learned that
she would not become the pharmacy manager at the store because Ms. Koelz had
selected Ken Horton to fill the position. (Doc. 26-1, p. 32; Doc. 26-2, p. 20). Ms.
Wesson was aware that Walgreens reduced her pay from $4,645.00 biweekly to
$4,520.00 biweekly no later than February 2008 when Ms. Wesson emailed Ms.
Koelz and questioned the change in pay. (Doc. 26-1, pp. 8, 22–23; Doc. 26-2, p.
20; Doc. 26-3, pp. 19–20). Thus, Ms. Wesson knew of the facts constituting the
alleged fraud by early 2008. (Doc. 26-2, p. 25). Ms. Wesson did not file her
lawsuit until August 27, 2012, more than four years after Ms. Wesson discovered

facts constituting the purported fraud.  Therefore, Alabama's two-year statute of limitations bars Ms. Wesson's fraud claim unless Alabama law provides relief from the statute of limitations.

Under Alabama law, a defendant may not rely on a statute of limitations defense to a fraud claim if the defendant induced the plaintiff to forego a lawsuit by promising to remedy the alleged fraud.  *See Birmingham v. Cochrane Roofing & Metal Co., Inc.*, 547 So. 2d 1159, 1167 (Ala. 1989) ("[I]f a defendant either fraudulently or innocently represents to the plaintiff that he will remedy a problem, and relying on these representations the plaintiff is induced not to file a lawsuit or take any action, the defendant may be estopped from raising the statute of limitations as a defense.").  Vague assurances to remedy a problem are not sufficient to prevent a defendant from relying on a statute of limitations defense. *Moore v. Nat'l Sec. Ins. Co., Inc.*, 477 So. 2d 346, 348 (Ala. 1985) ("In general, conduct which is sufficient to give rise to an estoppel against the pleading of the statute of limitations must amount to an affirmative inducement to the plaintiff to delay bringing the action.").  In applying estoppel to a statute of limitations defense, the Alabama Supreme Court has held that reliance on the promise to remedy must be reasonable.  *Cochrane*, 547 So. 2d at 1167 (". . . [W]e limit [the estoppel] doctrine by requiring a standard of reasonable reliance.").

11

Ms. Wesson argues that Walgreens is estopped from raising the statute of limitations as a defense because Walgreens "continually represented" that "there was a possibility that the fraud would be remedied." (Doc. 28, p. 19–20). Specifically regarding Ms. Wesson's desire to become the pharmacy manager at the Chelsea store, Ms. Wesson points to three statements that Ms. Koelz allegedly made in the fall of 2007 as evidence to support her estoppel argument. First, when Ms. Koelz met Ms. Wesson for the first time, Ms. Koelz told Ms. Wesson "that, with [Ms. Wesson's] credentials, [Ms. Koelz] would have hired [Ms. Wesson] anyway . . . and that [Ms. Koelz] would do what she could to put [Ms. Wesson] in a store." (Doc. 26-1, pp. 14–15). Second, when Ms. Wesson complained about being scheduled as a "floater" instead of as the pharmacy manager at the Pell City store, Ms. Koelz told Ms. Wesson that Ms. Wesson would have to "float until a position opens up." (Doc. 26-6, p. 14). Finally, Ms. Koelz told Ms. Wesson in October 2007 that Ms. Wesson "would be given the opportunity to apply at Chelsea, but [Ms. Wesson] would also be competing against people who are already pharmacy managers for Walgreens." (Doc. 26-6, p. 6).

None of these statements rises to the level of a promise or assurance to Ms. Wesson that she would become the Chelsea pharmacy manager. To the contrary, Ms. Koelz's first two statements generally allude to Ms. Wesson's placement "in a store" or "in a position," and the third statement affirmatively indicates that Ms.

Wesson was not assured of the pharmacy manager position at the Chelsea store. Ms. Wesson could not have reasonably relied on these statements as a basis for delaying legal action based upon Walgreens's purported fraudulent promise that she would become the pharmacy manager at the Chelsea store when the store opened.

Regarding Ms. Wesson's pay, Ms. Wesson does not identify specific promises or assurances that Walgreens made regarding her income.  Ms. Wesson emailed Ms. Koelz in February 2008 to ask why her salary was reduced from $4,645.00 biweekly to $4,520.00 biweekly. Ms. Koelz responded that Ms. Wesson's new salary was tied to her new geographic region and that "the system did a payroll adjustment to the [Birmingham] rates."  (Doc. 26-3, p. 19).  Ms. Koelz told Ms. Wesson "the only way that [Ms. Wesson] could take the salary that was originally offered would be to transfer [from Pelham] back to the Pell City store."  (Doc. 26-6, p. 7).  This statement is not a promise to remedy an alleged false promise regarding Ms. Wesson's pay.   Instead, Ms. Koelz informed Ms. Wesson that if Ms. Wesson remained in the Birmingham South district, her pay would not increase.

Ms. Wesson relies on another email in which Ms. Koelz told Ms. Wesson that she (Ms. Koelz) would "check into" the salary issue. (Doc. 26-3. p. 18).  Ms. Koelz's statement that she would "check into" Ms. Wesson's concerns about the

reduction in pay is the type of vague assurance that does not constitute sufficient inducement to give rise to estoppel. *See Moore*, 477 So. 2d at 348 (statements from the defendant that it was "checking into the problem" or that it "was still checking" were not sufficient to induce the plaintiffs to refrain from pursuing their claims).

Because Walgreens is not estopped from asserting the statute of limitations and because Ms. Wesson waited more than two years before filing her fraud claim, the Court will enter judgment as a matter of law in favor of Walgreens on that claim.

### B.    Ms. Wesson's breach of contract claim fails as a matter of law.

To establish a breach of contract under Alabama law, a party must show "(1) the existence of a valid contract binding the parties in the action, (2) [the party's] own performance under the contract, (3) [the opposing party's] nonperformance, and (4) damages." *GE Capital Aviation Serv's, Inc. v. Pemco World Air Serv's, Inc.*, 92 So. 3d 749, 763 (Ala. 2012) (quoting *Employees' Benefit Ass'n v. Grissett*, 732 So. 2d 968, 975 (Ala. 1998)) (internal quotation marks omitted).  Ms. Wesson alleges that Walgreens breached its promises that she would become the pharmacy manager at the Chelsea store when the store opened and that she would receive certain income including pharmacy manager bonuses.  Ms. Wesson also claims that Walgreens wrongfully terminated her employment.

14

Ms. Wesson's breach of contract claim fails because Ms. Wesson was an at-will employee.  The July 25, 2007 written offer of employment that Walgreens provided to Ms. Wesson states:  "You should not consider our offer of employment to be a contract or guarantee of indefinite employment.  Employment at Walgreens is at will, is for no definite term, and is subject to Walgreens policies, which can be changed from time to time."  (Doc. 26-3, p. 4).   Similarly, the terms of Ms. Wesson's sign-on incentive bonus state:   "This incentive payment arrangement shall not be considered a contract or guarantee of employment for a definite period.  As always, either Pharmacist or Walgreens may terminate the relationship for any reason at any time with or without notice."  (Doc. 26-3, p. 6).   These two documents emphasize that Ms. Wesson was an "at-will" employee, and the offer letter makes clear that Walgreens could change the terms of employment unilaterally at any time.  Therefore, Walgreens and Ms. Wesson did not enter into an enforceable employment contract. *See Jackson v. Cintas Corp.*, 391 F. Supp. 2d 1075, 1102 (N.D. Ala. 2005) (granting summary judgment in favor of the employer and finding that no valid employment contract existed between the employee and employer because the employer's partner reference guide "expressly disavow[ed] any contractual agreement as to the terms of employment and emphasize[d] that all employment [was] 'at will'"); *Wade v. Chase Manhattan Mortgage Corp.*, 994 F. Supp. 1369, 1377 (N.D. Ala. 1997) (stating that an at-will

employee has "no claim for breach of any employment contract.") (citing *Smith v. Reynolds Metals Co.*, 497 So. 2d 93 (Ala. 1986)); *see generally White Sands Grp., L.L.C. v. PRS II, LLC,* 998 So. 2d 1042, 1051–53 (Ala. 2008) (under Alabama law, whether a contract "fails for indefiniteness is properly a question of law.").

To the extent Ms. Wesson bases her breach of contract claim on Ms. Cochran's pre-employment promises that Ms. Wesson would be the pharmacy manager at the Chelsea store when the store opened or that she would receive certain pharmacy manager bonuses, Ms. Wesson has not provided any evidence that these statements "constituted any agreement separate or distinct from the terms and conditions of [her] at-will employment arrangement with [Walgreens]." *Wade*, 994 F. Supp. at 1378.  Ms. Cochran's promises to Ms. Wesson before she started working for Walgreens in August 2007 that Ms. Wesson would be the pharmacy manager of the Chelsea store when the store opened and that Ms. Wesson would earn certain income, including pharmacy manager bonuses "necessarily defined the conditions of [her] employment with any breach only occurring during the employment relationship." *Id.*  Therefore, "any claim for the breach of such promises would be barred by the at-will employment doctrine." *Id.*

Ms. Wesson's arguments that she was not an at-will employee are unpersuasive.  To show that her employment relationship with Walgreens was one other than at-will, Ms. Wesson must demonstrate "(1) that there was a clear and

unequivocal offer of lifetime employment or employment of definite duration, . . . (2) that the hiring agent had authority to bind the principal to a permanent employment contract, . . . and (3) that [she] provided substantial consideration for the contract separate from the services to be rendered." *Hoffman-La Roche, Inc. v. Campbell*, 512 So. 2d 725, 728 (Ala. 1987).  If Ms. Wesson fails to meet any one of these three requirements, the Court need not examine the others.  *See Ex parte Michelin North Am., Inc.*, 795 So. 2d 674, 678 (Ala. 2001).

The record contradicts Ms. Wesson's assertion that Walgreens's offer of employment was one for a definite duration.  Ms. Wesson has not produced evidence demonstrating that Ms. Cochran orally offered Ms. Wesson employment of a definite duration.   Instead, Ms. Wesson "thought that she had a contract to work with Walgreens for a period of two years" because Ms. Cochran's offer letter was accompanied by a sign-on bonus incentive payment that Ms. Wesson had to repay if she worked for Walgreens for less than two years.   (Doc. 28, p. 19).  But the terms of the pharmacy incentive program refute Ms. Wesson's belief that she received the payment in exchange for a two-year contract.  The incentive payment terms expressly provide that the "incentive payment arrangement shall not be considered a contract or guarantee of employment for a definite period." (Doc. 26-3, p. 6).  And the offer letter also contained language explaining that Ms. Wesson's employment with Walgreens was for "no definite term" and was "subject to

17

Walgreens policies, which can be changed from time to time." (Doc. 26-3, p. 4). Because Ms. Wesson was an at-will employee and because the terms of the employment relationship between Ms. Wesson and Walgreens were not definite but instead were subject to revision by Walgreens "from time to time," Ms. Wesson's contract claims fail as a matter of law.

### IV.   <u>CONCLUSION</u>

For the reasons discussed above, there is no genuine issue of material fact for a jury to resolve in this case.  Instead, Walgreens is entitled to judgment as a matter of law on Ms. Wesson's fraud and breach of contract claims.  Therefore, the Court **GRANTS** Walgreens's motion for summary judgment.  The Court will enter a separate order consistent with this memorandum opinion dismissing this action with prejudice.

**DONE** and **ORDERED** this September 25, 2015.

_Madeline H. Haikala_
**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE